United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 20, 2021

Nathan Ochsner, Clerk

## IN THE UNITED STATED BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-34405** |
| **FORD STEEL, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

## <u>MEMORANDUM OPINION</u>

Ford Steel, LLC, an American Institute of Steel Construction certified steel fabricator that utilizes state-of-the-art computer numerical control machinery to fabricate platforms, skids, ladders, communication/broadcast towers, and custom fabrication for oil, petrochemical, broadcast industries, and other customers worldwide has been operating as a debtor-in-possession throughout this chapter 11 proceeding during an unprecedented time of shut downs, work interruptions, and sheltering in place due to the COVID-19 pandemic. Throughout the pandemic, Ford Steel, LLC, retained and paid approximately 60 employees without the assistance of the federal government. Nevertheless, the United States of America contends that this case should be dismissed or converted for "cause"—whatever is in the best interest of the creditors and the estate—pursuant to 11 U.S.C. § 1112(b)(4)(A) because the estate is suffering substantial or continuing loss, and there is no reasonable likelihood of rehabilitation. In the alternative, the United States of America requests appointment a chapter 11 trustee for cause. For the reasons stated herein, the motion is denied.

### I. Findings of Fact

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, incorporating Federal Rules of Civil Procedure 52 and 9014. To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such. To the

extent that any conclusion of law constitutes a finding of fact, it is adopted as such.  This Court made certain oral findings and conclusions on the record.  This Memorandum Opinion supplements those findings and conclusions.  If there is an inconsistency, this Memorandum Opinion controls.

1.    On September 1, 2020, Ford Steel, LLC ("*Debtor*") filed a petition under chapter 11 of the United States Bankruptcy Code.[1]

2.    On September 29, 2020, United States of America ("*USA*") filed its proof of claim alleging $4,589,610.98 as secured, $333,517.64 as priority, and $144,647.33 as general unsecured for a total of $5,067,775.95 ("*Proof of Claim*").[2]

3.    On October 5, 2020, the Court held its initial status conference and ordered that a disclosure statement and plan be filed no later than December 31, 2020.[3]

4.    On December 31, 2020, Debtor filed its disclosure statement and plan of reorganization ("*Plan*").[4]

5.    On February 9, 2021, the Court, after a hearing, approved the disclosure statement.[5]

6.    On May 27, 2021, USA filed the instant "Expedited Motion by the United States to Either (a) Appoint Chapter 11 Trustee or (b) Convert Case to Chapter 7" ("*Motion*").[6]

7.    On May 28, 2021, Debtor filed a motion to employ James M. Pratt of Colliers International Houston, Inc. ("*Colliers*") as Debtor's real estate broker to market and find a buyer for 6.0025 acres of land being Tracts 4-A and 7-B in the M.H. Short Survey, Abstract 535, Montgomery County, Texas, ("*Property*").[7]

8.    On June 4, 2021, Debtor filed its response ("*Response*") to the Motion.[8]

9.    On June 8, 2021, the Court held a preliminary hearing on the Motion and scheduled an evidentiary hearing for June 28, 2021.[9]

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e.§) thereof refers to the corresponding section in 11 U.S.C.  ECF No. 1.
[2] Claim No. 3.
[3] ECF No. 44.
[4] ECF Nos. 67, 68.
[5] ECF No. 78.
[6] ECF No. 100
[7] ECF No. 101.
[8] ECF No. 118.
[9] ECF No. 121.

10. On June 25, 2021, Debtor filed its first modification to the Plan.[10]

11. As of June 22, 2021, Debtor is current on the filing of its Monthly Operating Reports.  Debtor is not current on the payment of quarterly United States Trustee's fees, owing approximately $40,000.[11]

12. On June 28, 2021, the Court held an evidentiary hearing on the Motion.  That hearing was continued to and concluded on July 8, 2021 ("*Hearing*").

## II.   Conclusions of Law

### A.   Jurisdiction, Venue, and this Court's Constitutional Authority to Enter Orders

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under title 11."  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[12]  This court determines that pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), the instant matter contains core matters because the Motion seeks relief under the United States Bankruptcy Code.

Furthermore, this Court may only hear a case in which venue is proper.[13]  Pursuant to 28 U.S.C. § 1409(a), "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."  Debtor's principal place of business is Houston, Texas, which is where the underlying bankruptcy case was filed. Therefore, venue is proper.

This Court has an independent duty to evaluate whether it has the constitutional authority to sign a final order.[14]  In *Stern,* which involved a core proceeding brought by the debtor under 28

---

[10] ECF No. 135.

[11] ECF No. 118 at 8.

[12] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

[13] 28 U.S.C. § 1408.

[14] *Stern v. Marshall*, 564 U.S. 462 (2011).  *But see Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1938–39 (2015) (holding that parties may consent to jurisdiction on non-core matters).

§ 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[15]  As indicated above, the pending dispute before this Court is a core proceeding.  The ruling in *Stern* was limited to the one specific type of core proceeding involved in that dispute, which is not implicated here.  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order.[16]

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2),[17] this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar.  In *Stern,* the debtor filed a counterclaim based *solely* on state law; whereas, here, the Motion is based on express provisions of the Bankruptcy Code—11 U.S.C. §§ 1104 and 1112—and judicially-created bankruptcy law interpreting these provisions.  This Court is therefore constitutionally authorized to enter a final order on the Motion.  Additionally, this Court has constitutional authority to enter a final order on the Motion because Debtor and USA have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.[18]  The parties have engaged in litigation in front of this Court, including numerous hearings and motions practice.  Neither party has objected to this Court's constitutional authority

---

[15] 564 U.S. at 503.

[16] *See, e.g.*, *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' . . . . We decline to extend *Stern*'s limited holding herein.") (citing *Stern*, 564 U.S. at 475, 503).

[17] *See First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.),* 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . .").

[18] *Sharif,* 135 S. Ct. at 1947 ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").

to enter a final order or judgment.  These circumstances unquestionably constitute implied consent.

Thus, this Court wields the constitutional authority to enter a final order here.

**B.  Whether cause exists to convert under § 1112(b)(4)(A)**

USA requests that this Court convert Debtor's chapter 11 case to a chapter 7 case because

Debtor allegedly suffers from a "substantial or continuing loss to or diminution of the estate and the

absence of a reasonable likelihood of rehabilitation[,]" constituting cause under § 1112(b)(4)(A) to

convert Debtor's case.[19]  Section 1112(b)(1) provides:

> . . . on request of a party in interest, and after notice and a hearing, the court
> shall convert a case under this chapter to a case under chapter 7 or dismiss a case
> under this chapter, whichever is in the best interests of creditors and the estate, for
> cause unless the court determines that the appointment under section 1104(a) of a
> trustee or an examiner is in the best interests of creditors and the estate.

Section 1112(b)(4) contains a non-exhaustive list of examples of cause meriting conversion or dis-

missal.  If the USA can establish cause under § 1112(b)(4)(A), conversion or dismissal becomes

mandatory because § 1112(b)(2) does not provide an exception to conversion or dismissal for

cause found under § 1112(b)(4)(A).[20]

"The inquiry under § 1112 is case-specific, focusing on the circumstances of each

debtor."[21]  While most chapter 11 debtors can effectuate a plan of reorganization in a matter of

months, certain debtors with more complex debt structures or business difficulties may require more

time.[22]  Each debtor's viability and prospects must be evaluated "in light of the best interest of cred-

itors and the estate."[23]  The party seeking dismissal or conversion bears the burden of proving cause

---

[19] ECF No. 100 at 8–9.

[20] 11 U.S.C. § 1112; *In re Ria, LLC*, 2010 Bankr. LEXIS 1167, at *4 (Bankr. D.C. April 8, 2010) ("When § 1112(b)(4)(A) applies, that renders § 1112(b)(2), by its own terms, unavailable for the court to decide not to dismiss or convert the case.").

[21] *United Savs Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 808 F.2d 363, 371–72 (5th Cir. 1987) (en banc).

[22] *Id.* at 372.

[23] *Id.*

by a preponderance of the evidence.[24]  To demonstrate cause pursuant to § 1112(b)(4)(A), the moving party must show there is both (1) a substantial or continuing loss to or diminution of the estate *and* (2) the absence of a reasonable likelihood of rehabilitation.[25]  The loss may be substantial or continuing; it need not be both.[26]  If the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial.[27]  Cause can be shown by demonstrating that the debtor suffered or continues to experience a negative cash flow or declining asset values following the order for relief.[28]  "Negative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b)."[29]

### 1.  Substantial or continuing loss to or diminution of the estate

USA asserts that Debtor has acknowledged the substantial loss on its April monthly operating report, having lost more than $1.2 million since this case started.[30]  As explained above, USA need not demonstrate a substantial *and* continuing loss to the estate to establish cause under § 1112(b)(4)(A); rather, USA must demonstrate a "substantial *or* continuing loss to or diminution of the estate."[31]  By providing evidence that Debtor lost in excess of $1.2 million since filing its petition, USA demonstrated a substantial loss to the estate and has satisfied the first prong of § 1112(b)(4)(A).

### 2.  Reasonable likelihood of rehabilitation

---

[24] *In re Woodbrook Assocs.,* 19 F.3d 312, 317 (7th Cir. 1994).

[25] *In re Creekside Senior Apartments, L.P.,* 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013).

[26] *Id.* (citing 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][i] (16th ed. 2014) ("By the use of the word "substantial" in section 1112(b)(4)(A), Congress has indicated that a loss need not be continuing in order to satisfy the first prong of this enumerated cause")).

[27] 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][i] (16th ed. 2014).

[28] *In re Paterno,* 511 B.R. 62, 66 (Bankr. M.D. N.C. 2014).

[29] *In re Miell,* 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) (citing *Loop Corp. v. United States Trustee,* 379 F.3d 511, 515–16 (8th Cir. 2004)).

[30] ECF No. 100 at 9 (citing ECF No. 99 at 6).

[31] 11 U.S.C. § 1112(b)(4)(A) (emphasis added).

To satisfy the second prong of § 1112(b)(4)(A), USA must show that Debtor does not have a reasonable likelihood of rehabilitation.[32]  Consideration under this prong extends beyond mere reorganization of a debtor.  As explained in *Collier*, "the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort."[33]  The Court must consider whether Debtor's continuing losses can be corrected and whether Debtor or another party in interest is capable of performing the necessary remediation to re-establish Debtor's business.[34]  Debtor must "do more than manifest unsubstantiated hopes for a successful reorganization."[35]  Debtor's remediation plan must be realistic with a reasonable probability of success.[36]  If USA demonstrates that Debtor cannot operate profitably and Debtor cannot show that it can correct the reason for its losses, then the second prong will be satisfied and this Court must convert Debtor's case.[37]

### a.  USA's evidence that rehabilitation of Debtor is not reasonably likely

USA asserts that Debtor is unlikely to sell the Property in an amount sufficient to fund a confirmable chapter 11 plan, and that Debtor does not have positive cash flow—meaning it cannot

---

[32] *In re Creekside Senior Apts., L.P.*, 489 B.R. at 61.

[33] 7 *Collier on Bankruptcy* ¶ 1112.04(6)(a)(ii) (16th ed. 2017) (citing *Sante Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.),* 386 B.R. 548, 552 (Bankr. D. Del. 2008), *rev'd on other grounds*, 400 B.R. 420 (D. Del. 2009), aff'd, 589 F.3d 605 (3d Cir. 2009)).

[34] *See* 7 *Collier on Bankruptcy* ¶ 1112.04(6)(a)(ii) (16th ed. 2017).

[35] *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (quoting *In re Canal Place, Ltd. P'ship*, 921 F.2d 569, 577 (5th Cir. 1991) (discussing the issue of "effective reorganization" in deciding whether to lift the automatic stay)).

[36] *See, e.g.*, 7 *Collier on Bankruptcy* ¶ 1112.04(6)(a)(ii) (16th ed. 2017) ("Visionary schemes that entail risk to creditors without any reasonable probability of success usually warrant prompt conversion to chapter 7."); *In re 865 Centennial Ave. Assocs. Ltd.*, 200 B.R. 800, 409–10 (Bankr. D. N.J. 1996) (finding that the debtor failed to show it had a possibility of successful reorganization and noting that no matter how sincere a debtor may be, the court "is not bound to clog its docket with visionary or impracticable schemes of resuscitation.").

[37] *See In re Irasel Sand, LLC*, 569 B.R. 433, 442 (Bankr. S.D. Tex. 2017) (analyzing and applying two cases wherein courts found that rehabilitation was not likely because the debtor could not operate profitably without outside financing and no prospects of outside financing was presented to the court); *see also In re Hyperion Found., Inc.*, 2009 Bankr. LEXIS, at *12–13 (Bankr. S.D. Miss. Aug. 11, 2009) ("The focus of the second prong of section 1112(b)(4)(A) is rehabilitation, a concept that involves the ability of a debtor to meet current obligations from a positive cash flow. Where as here the Debtor is experiencing financial losses post-petition, the issue is whether the Debtor can correct the reasons for the losses.")

afford to lease a new location and reorganize through operations there.[38]  USA submits that: (1) Debtor would need to sell the Property for nearly $10.5 million to pay claims secured by that Property in full plus its chapter 11 administrative expenses (calculating claims secured by the Property,[39] administrative expenses,[40] and sales costs at $10,454,082.32), which is 10% greater than the most recent appraisal of the Property;[41] (2) USA's $10.5 million estimate does not include other obligations such as Debtor's debt of $475,764 to First Financial secured by Debtor's equipment,[42] and quarterly fees owed by Debtor to the United States Trustee estimated at $40,000;[43] and (3) Debtor is "dangerously close—if not already there—to having insufficient cash to make payroll[.]"[44]  USA additionally urges this Court to consider that selling the Property at $10,454,082 would leave no money for general unsecured creditors.[45]  At the Hearing, USA argued that Debtor's brittle financial condition will be exacerbated if Debtor is permitted to sell the Property and lease it back for a proposed $920,000 for the first year in addition to a $1,200,000 security deposit, as required by the Exclusive Sale and Leaseback Listing Agreement submitted by Debtor.[46]

USA also focuses on Debtor's historical financial performance to support its position.  Citing several cases to include *In re Mangia Pizza Investments, LP*,[47] USA argues that Debtor's past

---

[38] ECF No. 100 at 9.

[39] *Id.* at 6–7 (citing Claim Nos. 1-2 (Montgomery County, Texas - $243,936), 5-1 (SILAC - $2,618,410), 2-1 (Texas Workforce Commission - $3,362), 3-1 (IRS - $4,589,611); ECF No. 28 at 11 (Small Business Administration - $159,900)).

[40] *Id.* (citing ECF No. 99 at 4 (post-petition trade payables - $1,504,258 and post-petition taxes - $24,216); ECF No. 91 at 15 (Debtor's counsel's fees capped at $50,000)).

[41] *Id.* at 7

[42] *Id.* (citing ECF No. 28 at 10).

[43] *Id.* (citing ECF No. 99 at 7).

[44] *Id.* at 2 (citing ECF No. 99 at 2, 8).

[45] *Id.* at 7.

[46] See ECF No. 134, Ex. E.

[47] 480 B.R. 669, 703 (Bankr. W.D. Tex. 2012) ("The Court questions how much more income the Debtor can generate if historical performance demonstrates that income does not exceed expenses and plan payments with any degree of commercial viability."); *see also, e.g.*, *In re W.R. Grace & Co.*, 446 B.R. 96, 141–42 (Bankr. D. Del. 2011); *In re Red Door Lounge, Inc.*, 559 B.R. 728, 734 (Bankr. D. Mt. 2016); *In re Charles Street African Methodist Episcopal Church*

performance is relevant when evaluating Debtor's future potential.  Summarizing several exhibits admitted into evidence, USA concluded that rehabilitation of Debtor is unlikely because Debtor's average net income from 2016–2020, excluding bad debt write off and balance sheet reconciliation, was -$2,436,831.84 per year and -$40,613.86 per month.[48]  Debtor's average net income during the life of this case, excluding bad debt write off and balance sheet reconciliation, is even more dire with a total loss of $1,173,546.87 for the year and an average loss of $130,394.10 each month from September 2020 to May 2021.[49]  Debtor's cash flow for those same months was likewise in the red, with an average loss of $6,990.03 per month.[50]  USA points out that since the petition date in September 2020, Debtor realized a profit only in October and December, and was in the red in September, November, January, February, March, April, and May.[51]

At the behest of Mr. Mark McElroy, Debtor's Chief Financial Officer, USA considered the net ordinary income of Debtor from 2016–2020, which averaged $9,874.06 per month[52] and the adjusted net income of Debtor, which averaged $2,223.25 per month, after considering Mr. McElroy's suggested revisions for one time obligations and expenses.[53]  USA then compared Debtor's average ordinary net income to the modified plan filed June 25, 2021.[54]  In year two of the modified plan, Debtor's propose to pay an average of $26,591.28 per month in plan payments and approximately $76,666.67 per month in rent, a total of about $103,258.95 per month.  USA insists there is no likelihood of rehabilitation or a feasible plan where the proposed plan payments

---

of Boston, 578 B.R. 56, 73–74 (Bankr. D. Mass. 2017); In re Am. Trailer and Storage, Inc., 419 B.R. 430 (Bankr. W.D. Mo. 2009).

[48] ECF No. 137, Ex. T.
[49] ECF No. 133, Ex. 20; ECF No. 134, Ex. H.
[50] ECF No. 133, Ex. 20; ECF No. 134, Ex. H.
[51] ECF No. 134, Ex. H.
[52] ECF No. 137, Ex. T; ECF No. 139 at 1:54:30–1:59:10.
[53] ECF No. 137, Ex. T; ECF No. 139 at 2:08:55–2:23:45.
[54] See ECF No. 135.

and rent—$103,258.95—exceed the average ordinary net income—$9,874.06—by $93,384.89.[55]

Debtor's present financial condition is no doubt delicate. Nonetheless, Debtor has histor-ically operated profitably, even if just barely, and USA's calculations consider only the second year of Debtor's Plan, not the first year where, as explained below, Debtor's average monthly payments will be significantly less and Debtor projects it will have an influx of cash from the § 363 sale its Property. The Court now turns to the evidence presented by Debtor to determine whether rehabilitation is reasonably likely.

### b. Debtor's evidence that rehabilitation is reasonably likely

Debtor maintains that it has faced an unusual circumstance—the COVID-19 pandemic—causing Debtor greater financial difficulties. Mr. Herbert Jeffries, Debtor's Managing Member, testified that because of the pandemic, Debtor's workload was decreased by approximately 70% from pre-pandemic levels, it was forced to reduce its hours, and many of its customers that were formerly on 30-day payment plans and provided deposits on jobs over $100,000 changed their terms to require 60- to 75-day payment plans.[56] Mr. Jeffries testified that in one instance, Debtor had to turn down a $275,000 job for one of its largest customers because the customer formerly provided large deposits for materials at the beginning of the job and began making payments in increments within one week but after the company awarded the job to Debtor, it changed its terms to extend payment 75 days beyond job completion.[57] Mr. Jeffries explained that this would have required Debtor to buy materials, execute the job, invoice the customer, and then wait 75 days for

---

[55] *See* ECF No. 133, Ex. 20; ECF No. 134, Ex. H; ECF No. 137, Ex. T; ECF No. 139 at 1:54:30–1:59:10, 2:08:55–2:23:45.
[56] ECF No. 148 at 3:05–5:14.
[57] *Id.* at 6:25–8:05.

payment.[58]  While Mr. Jeffries noted that this was one of the more extreme examples, many customers doubled the length of time for payment.[59]

Mr. Jeffries also testified that Debtor would have received over $1.5 million in Paycheck Protection Program loans ("*PPP Loans*") from 2020–2021, were it not for Debtor's bankruptcy status.[60]  Without the help of the PPP Loans, which the federal government offered to businesses so they could keep their workforce employed, Debtor bid jobs at cost and solely operated on income from receivables to keep its approximately 60 skilled employees working.[61]  Debtor also spent $7,500 every two weeks to test employees for COVID-19.[62]

A debtor's burden to demonstrate "unusual circumstances" under § 1112(b)(2) to overcome conversion or dismissal is not applicable where a party-in-interest has established cause to convert or dismiss under § 1112(b)(4)(A), but because USA has not conclusively established that Debtor has no chance at rehabilitation, this Court finds the "unusual circumstances" prong of § 1112(b)(2) helpful.  The phrase "unusual circumstances" is not defined in the Bankruptcy Code, but "the word 'unusual' contemplates facts that are not common to chapter 11 cases generally."[63]  Generally, determining whether unusual circumstances exist is a fact intensive inquiry.[64]  Here, however, there is one significant fact that persuades this Court unusual circumstances exist in this chapter 11 case: the global COVID-19 pandemic.  The pandemic, rivaled only by the Spanish Flu of 1918, shuttered nonessential businesses, people were ordered to shelter in place around the globe, oil and gas prices fell below zero, and the federal government made PPP Loans and issued

---

[58] *Id.* at 6:25–8:05.
[59] *Id.* at 6:25–8:05.
[60] *Id.* at 3:00–4:15.
[61] *Id.* at 8:06–8:48.
[62] *Id.* at 5:15–6:22.
[63] *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 496 (Bankr. S.D. Tex. 2013) (citing 7 *Collier on Bankruptcy* ¶ 1112.05[2]).
[64] *Id.*

stimulus checks to individuals, attempting to keep the economy stable and food on the table.  If the global COVID-19 pandemic is not an unusual circumstance, this Court cannot fathom what is.[65]

All financial hope is not lost, however.  Mr. Jeffries testified that Debtor's business is starting to turn around and that the backlog of business has increased three-fold since January 2021, with large jobs booking for the third quarter of this year.[66]  Debtor has a $2 million job scheduled to release in September and a $200,000 job releasing in the fourth quarter of 2021.[67]  Mr. Jeffries estimated that Debtor's profit margin on each of these jobs will be 15%.[68]  Mr. Jeffries also testified that he conducted a Google search wherein he learned that seven local fabrication businesses in the Houston area and three in other markets are now out of business, which helps Debtor because there is less market competition.[69]

Moreover, Debtor proposes a § 363 sale of its Property and projects that the sale will secure a significant influx of cash for Debtor.  Because this Court must consider whether Debtor's remediation efforts are realistic and not merely an unsubstantiated hope of reorganization,[70] this Court finds the "reasonably likelihood that a plan confirmed in a reasonable time" prong of § 1112(b)(2) instructive.  The "reasonable likelihood" standard under § 1112(b)(2)(A) is less stringent than the

---

[65] *Cf. VLSI Tech. LLC v. Intel Corp.*, 2020 U.S. Dist. LEXIS 248378, at *11 (W.D. Tex. Dec. 31, 2020) ("Further, the court has stated and Intel does not dispute that the pandemic presents a quintessential 'unusual and impelling circumstance' in which to order transfer.") (granting the plaintiff's motion to transfer its case back to the original division in part because the COVID-19 pandemic, a post-transfer event, frustrated the original purpose for transfer to the new division).

[66] ECF No. 148 at 4:20–4:45, 8:45–10:20, 31:12–32:12.

[67] *Id.* at 31:32–32:12.

[68] *Id.* at 31:32–32:12.

[69] *Id.* at 8:45–10:20.

[70] *See* 7 *Collier on Bankruptcy* ¶ 1112.04(6)(a)(ii) (16th ed. 2017); *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (quoting *In re Canal Place, Ltd. P'ship*, 921 F.2d 569, 577 (5th Cir. 1991) (discussing the issue of "effective reorganization" in deciding whether to lift the automatic stay)).

confirmation standard of § 1129.[71]   Under the reasonable likelihood standard, the Court merely

performs an evaluation of the likelihood of Debtor achieving confirmation, based on the evidence

presented by Debtor.[72]   Debtor must show that reorganization is plausible and not, as the *Ramreddy*

court put it, "a mere financial pipe dream."[73]   The Court considers whether Debtor's Plan is likely

feasible; in other words, is Debtor's Plan workable and does it have a reasonable likelihood of

success?[74]

In Debtor's Response to USA's Motion, Debtor argued that should the Property sell for

$10,000,000, it would be able to pay the costs of the sale, the Montgomery County real property

taxes, the Texas Workforce Commission, Steel Pipe & Supply's administrative claim, and the se-

cured claims of SILAC/Equitable, First Financial, and the IRS, plus the first year's rent on the

leaseback and deposit, netting $124,336.32 in remaining funds.[75]   However, Mr. Jeffries testified

that James M. Pratt with Colliers brought several interested buyers to Debtor and that Debtor has

offered to sell the Property to one of those potential buyers for $10,825,000.[76]   Debtor's Exclusive

Sale and Leaseback Listing Agreement with Colliers reflects the same sales price.[77]   The following

chart demonstrating how the sales proceeds would be allocated was admitted into evidence:

| Table I | | | |
|---|---|---|---|
| **Item[78]** | **Description** | **Expenses** | **Net Amount** |

---

[71] *In re Delta AG Grp., LLC*, 596 B.R. 186, 198 (Bankr. W.D. La. 2019) (citing *In re Sterling WH Co., LLC*, 475 B.R. 481, 485 (Bankr. E.D. Va. 2012)).

[72] *See In re Sterling WH Co., LLC*, 475 B.R. at 485 ("The standard in § 1112(b)(2)(A) is lower than the confirmation standard in § 1129. Section 1112(b)(2)(A) only requires that there be a reasonable likelihood that a plan will be con-firmed. It is not a confirmation hearing. It is an evaluation of the likelihood of achieving confirmation.")

[73] *In re Ramreddy, Inc.*, 440 B.R. 103, 114 (Bankr. E.D. Pa. 2009).

[74] *In re Delta AG Grp., LLC*, 596 B.R. at 198 (citing Fin. *Sec. Assurance Inc. v. T-H New Orleans Ltd., P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997)).

[75] ECF No. 118 at 4–5.

[76] ECF No. 148 at 14:50–15:10, 21:37–23:47.

[77] ECF No. 134, Ex. E.

[78] All items in the table are extracted from ECF No. 137, Ex. W.  Mr. Jeffries also testified at the hearing that Debtor offered to sell the Property for $10,825,000 and offered to pay the first year's rent in advance along with a $1.2 million deposit.  He testified that the sales proceeds would be used to pay all secured claims, to include the IRS's secured claims, amongst other expenses and approximately $600,000 working capital would be leftover to pay unsecured

| | | | |
|---|---|---|---|
| Sale Price | Property | | $10,825,000.00 |
| Commission | at 4.5% based on $9M | $405,000.00 | |
| Commission | at 5% based on $1.825M | $91,250.00[79] | |
| Title Policy | | $44,315.00 | |
| Closing Costs | | $5,000.00 | |
| Montgomery County | With interest at the rate of 12% per annum from date of filing to August 31, 2021 | $274,746.43 | |
| SILAC/Equitable | Plus, SILAC's attorney Bruce Ruzinsky's additional fees - some will be offset by the monthly payments | $2,618,410.00 | |
| First Financial | Offset by the monthly payments | $475,765.00 | |
| Texas Workforce Commission | | $3,362.30 | |
| Internal Revenue Service Secured Claim | Plus, interest at the rate of about 3% from date of filing to closing | $3,727,064.95 | |
| U.S. Trustee Fees | | $86,600.00 | |
| Past Due U.S. Trustee Fees | | $37,675.78 | |
| Steel Pipe & Supply Admin Claim | | $172,000.00 | |
| | | | |
| | **Sub Total Expenses** | **$7,941,189.46** | |
| | **Net Proceeds from Sale** | | **$2,883,810.54** |
| First year rent plus deposit | | $2,320,000.00 | |
| | | | |
| | **Total Remaining Funds** | | **$563,810.54** |

Debtor argues that because the first year's lease plus deposit will be paid with sales proceeds, it

can utilize its regular monthly lease obligations for the next twelve months in addition to its

---

portions of the IRS's claim.  ECF No. 148 at 21:37–23:47. The Court notes that although Mr. Jeffries testified that the security deposit on the Property would be $1.2 million, Debtor's Ex. W leaves $1.4 million for the security deposit after $920,000 is deducted for the first year's rent.  ECF No. 137, Ex. W.

[79] ECF No. 137, Ex. W lists the commission as five percent of $1,000,000 for a total of $91,250.  That calculation is incorrect because five percent of $1,000,000 is $50,000.  However, ECF No. 134, Ex. E, the Exclusive Sale and Leaseback Listing Agreement between Debtor and Colliers International Houston, Inc., indicates that, "[s]o long as Jim Pratt is the only broker in the transaction, Colliers will receive an additional on[e]-half percent (0.5%) on the portion of the Purchase Price that exceeds Nine Million Dollars ($9,000,000.00)."  Here, the amount of the proposed sale price that exceeds $9,000,000 is $1,825,000.  Five percent of $1,825,000 is $91,250.  Thus, this Court has corrected Debtor's clerical error in Ex. W, as reflected above.

monthly cash flow to make payments to remaining general unsecured creditors under the Plan.[80]

Debtor's proposed average monthly Plan payments for years one through nine of

Debtor's Plan are summarized as follows:

| Table II | | | |
|---|---|---|---|
| **Year[81]** | **Payments on Claims** | **Rent** | **Total** |
| | | | |
| 1 | $23,257.95 | $0.00 | $23,257.95 |
| 2 | $26,591.28 | $78,200.00 | $104,791.28 |
| 3 | $26,591.28 | $79,764.00 | $106,355.28 |
| 4 | $26,591.28 | $81,359.28 | $107,950.56 |
| 5 | $26,591.28 | $82,986.47 | $109,577.75 |
| 6 | $20,731.00 | $84,646.20 | $105,377.20 |
| 7 | $20,731.00 | $86,339.12 | $107,070.12 |
| 8 | $20,731.00 | $88,065.90 | $108,796.90 |
| 9 | $20,731.00 | $89,827.22 | $110,558.22 |
| Note: Debtor's Plan also contemplates the payments of attorneys' fees not to exceed $125,000 in the first year after confirmation. However, these claims are subject to approval of this Court and thus, not included in this chart.[82] | | | |

Debtor's first-year payments consist of $5,860.28 to the IRS for its priority claim,[83] $731 to the

Small Business Administration,[84] and $50,000 per quarter for the first year to Debtor's general

unsecured creditors.[85] In Debtor's second through ninth years, Debtor will pay $60,000 per quarter

to Debtor's general unsecured creditors[86] and Debtor will be subject to rent payments, increasing

by two percent each year.[87] Debtor's Plan contemplates that it will satisfy the IRS's priority claim

at the end of the fifth year and thus, in the sixth through ninth years, Debtor will no longer pay

---

[80] ECF No. 118 at 4–5.
[81] All figures listed in this table are extracted from Debtor's Plan filed June 25, 2021 at ECF No. 135.
[82] ECF No. 135 at 6.
[83] *Id.* at 7.
[84] *Id.* at 12.
[85] *Id.* at 13.
[86] *Id.*
[87] ECF No. 134, Ex. E.

$5,860.28 to the IRS per month.[88]  Debtor's Plan also provisions for payment of the yet unknown

quarterly US Trustee fees when accrued.[89]

Debtor estimates it will receive $563,810.54 in unencumbered funds from the sale of the

Property.[90]  That amount could fund Debtor's Plan for the entire first year, plus the maximum

estimated amount of Debtor's legal fees at $125,000,[91] leaving about $159,715.14 in excess funds

for payment of US Trustee fees or future plan payments.  This cash influx, in addition to Debtor's

job prospects as testified to by Mr. Jeffries, assures this Court that Debtor has a realistic remedia-

tion plan, and that its hope of reorganizing is substantiated.[92]  Any doubts cast by USA as to

Debtor's ability to rehabilitate itself have been assuaged by the evidence presented by Debtor.

Debtor has shown that the losses Debtor experienced since filing for bankruptcy are reasonably

likely to be corrected.  Accordingly, USA has not sufficiently demonstrated that Debtor has no

reasonable likelihood of rehabilitation.  USA's Motion to Convert for cause under § 1112(b)(4)(A)

is denied.

### C.  Whether cause exists to convert under § 1112(b)(4)(E) or § 1112(b)(4)(J)

USA asserts that the Court ordered Debtor to "file a confirmable chapter 11 plan on or

before December 31, 2020," but Debtor has not done that; the only plan Debtor filed is incapable

of confirmation due to Debtor's ongoing losses.[93]  Thus, USA concludes, cause exists for

---

[88] ECF No. 135 at 7.

[89] *Id.* at 6–7.

[90] See Table I.

[91] ECF No. 135 at 6.

[92] *Compare In re Hyperion Found, Inc.*, 2009 Bankr. LEXIS 4647, at *12–16 (finding that the debtor demonstrated that rehabilitation was likely because the debtor predicted an increase in the number of patients and reduction of its pre-petition debts, causing an increase in assets and a decrease in the claims to be paid from those assets), *with In re Irasel Sand, LLC*, 569 B.R. at 442 (Bankr. S.D. Tex. 2017) (finding that the debtor had no likelihood of rehabilitation because the debtor had negative equity because the claim of its secured creditor exceeded the value of the debtor's assets, leaving a deficiency, there was testimony that the debtor could not operate without post-petition financing, but none was in place, and the debtor had a negative cash flow and no cash on hand).

[93] ECF No. 100 at 9.

conversion pursuant to 11 U.S.C. § 1112(b)(4)(E)—failure to comply with an order of the court—and § 1112(b)(4)(J)—failure to file or confirm a plan within the time fixed by order of the court.[94]

On December 31, 2020, Debtor timely filed its Disclosure Statement and Plan,[95] and on February 9, 2021, this Court approved the Disclosure Statement and set a Plan confirmation hearing for March 10, 2021.[96]   On March 3, 2021, the Court, by agreement of, inter alia, USA and Debtor, continued confirmation of the Plan to May 12, 2021.[97]  Again on April 21, 2021, the Court, by agreement of, inter alia, USA and Debtor, continued confirmation of the Plan to August 23, 2021, to permit Debtor to hire a real estate broker to market and sell the Property.[98]

Nevertheless, on May 27, 2021, USA filed the instant Motion.[99]  The next day, Debtor filed its application to employ realtor James M. Pratt of Colliers.[100]  On June 25, 2021, Debtor modified its Plan and now proposes a § 363 sale of Debtor's Property, which will permit the payment in full of all Debtor's secured and administrative claimants other than Debtor's counsel, as described in Table I supra.[101]

The protection a debtor receives under the Bankruptcy Code comes with an obligation to strictly abide by the bankruptcy court's orders.[102]  Section 1112(b)(4)(E) embodies that principle. Cause to convert pursuant to § 1112(b)(4)(E) exists if a debtor fails to comply with a single order; a pattern of non-compliance is not required by the statute.[103]  Nor does § 1112(b)(4)(E) require a

---

[94] *Id.*
[95] ECF No. 68.
[96] ECF No. 78.
[97] ECF No. 82.
[98] ECF No. 94.
[99] ECF No. 100.
[100] ECF No 101.
[101] ECF No 135.
[102] *In re Babayoff*, 445 B.R. 64, 80 (Bankr. E.D.N.Y. 2011) (citing *Babakitis v. Robino (In re Robino)*, 243 B.R. 472, 487 (Bankr. N.D. Ala. 1999)).
[103] *In re Hoyle*, 213 Bankr. LEXIS 420, at *30–31 (Bankr. D. Ida. Jan. 17, 2013) ("Instead, '[t]he statute [§ 1112(b)(4)(E)] is written in the singular; thus failure to comply with a single order is sufficient for cause.'") (quoting *In re Bijelonic*, 2012 U.S. Dist. LEXIS 84130, at *12–13 (C.D. Cal. June 15, 2012)).

debtor's non-compliance to be willful, in bad faith, or fraudulent.[104]   Here, Debtor did file a plan by December 31, 2020 as this Court ordered and USA's unsupported assertion that it intended to file an objection to confirmation of the plan is not enough to persuade this Court that the plan was unconfirmable.   In advance of the original confirmation date and again before the first continued confirmation date, Debtor filed the appropriate motions to continue confirmation.   USA agreed to the continuation of confirmation.   The confirmation hearing has not yet been held.

Section 1112(b)(4)(J) may provide relief where a debtor fails "to make meaningful and substantive progress toward the confirmation of a plan within the time periods fixed by the Bankruptcy Code and any court orders[.]"[105]   A lack of progress can cause undue delay and is prejudicial to creditors.[106]   In *In re Star Ambulance Service, LLC*, this Court found that cause did not exist to convert or dismiss the debtor's bankruptcy case pursuant to § 1112(b)(4)(J) because this Court did not issue an order mandating plan confirmation within a certain time period, nor did § 1121(e)(2).[107]   In other instances, courts have converted cases based on a lack of progress toward confirmation anywhere between six months and two years post-petition.[108]

This Court ordered Debtor, at behest of the parties, to file a confirmable plan on or before December 31, 2020.[109]   No confirmation hearing was held on that December 31, 2020 plan because

---

[104] *In re Babayoff*, 445 B.R. at 80 (citing *In re Tornheim*, 181 B.R. 161 (Bankr. S.D.N.Y. 1995)).

[105] *In re Babayoff*, 445 B.R. at 64, 79.

[106] *Id.*

[107] 540 B.R. 251, 269 (Bankr. S.D. Tex. 2015).

[108] *See, e.g.*, *In re M & C P'ship*, 2021 Bankr. LEXIS 1135, at *26 (Bankr. E.D. La. Apr. 18, 2021) (finding that movants demonstrated cause to dismiss or convert pursuant to § 1112(b)(4)(J) because the debtor failed to confirm a plan within 22 months of filing bankruptcy); *In re Babayoff*, 445 B.R. at 79 (finding cause to convert under, inter alia, § 1112(b)(4)(J) because the debtor failed to demonstrate the ability to file and confirm a complete and feasible plan two years into the case); *In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 459 (S.D.N.Y 1985) (finding cause to dismiss because the debtor had not filed a plan of reorganization six months into bankruptcy nor was in any position to do so in the near future); *In re Van Eck*, 425 B.R. 54, 65 (Bankr. D. Conn. 2010) (finding cause to dismiss where eighteen months into bankruptcy debtor filed a plan funded by speculative inheritance and funds generated from an entity yet to be formed); *In re Tornheim*, 181 B.R. at 165 (finding cause to convert or dismiss after the debtor failed to file a plan of reorganization sixteen months into bankruptcy and that failure caused an unreasonably and prejudicial delay).

[109] ECF No. 31.

the confirmation deadline was twice extended by agreement of USA and others.[110]  Although USA attempted to demonstrate that Debtor's December 31, 2020 plan was unconfirmable at the Hearing on USA's Motion, no formal confirmation hearing was ever held and thus, the confirmability of that plan is uncertain and because Debtor filed a modified plan on June 25, 2021, confirmability of the original plan will never be ascertained.

Debtor's June 25, 2021 modified plan accounts for the contemplated § 363 sale of the Property and payment of certain secured and administrative claims.  That confirmation hearing on that Plan is still set for August 23, 2021.  In preparation of confirmation, Debtor obtained an up-dated appraisal on the Property[111] and is working with James M. Pratt at Colliers to market the property.  These efforts demonstrate that Debtor is making meaningful and substantive progress toward confirmation of its Plan.[112]  Accordingly, USA's Motion on the basis of §§ 1112(b)(4)(E) and (b)(4)(J) is premature and is therefore denied.

### D.  Whether a Trustee should be appointed under § 1104

USA requests, in the alternative, that this Court appoint a chapter 11 trustee in this case.[113]  USA's sole complaint is that Debtor has not applied to this Court to retain a broker even though Debtor moved this Court for additional time to conduct a sale process.[114]

The Bankruptcy Code generally permits chapter 11 debtors to remain in control of their assets and business operations.[115]  Termed debtor-in-possession, they owe fiduciary duties to the bankruptcy estate.[116]  Such fiduciary duties include a duty of care to protect the assets, a duty of

---

[110] ECF Nos. 81, 92.
[111] ECF No. 134, Ex. C.
[112] *Id.* Exs. E, R.
[113] ECF No. 100 at 10.
[114] *Id.* at 9.
[115] *In re Adelphia Commc'ns. Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006).
[116] *In re Eurospark Industries, Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010).

loyalty, and a duty of impartiality.[117]  To fulfill its duties, a debtor-in-possession must avoid self-dealing, conflicts of interest, and the appearance of impropriety.[118]  When a debtor-in-possession is incapable if performing its statutory duties, a chapter 11 trustee may be appointed.[119]  However, the appointment of a trustee is the exception, rather than the rule, and is an extraordinary remedy.[120]  Although the Code contains no particular standard of proof, the majority view is that the party moving for appointment of a trustee must prove the need for a trustee by clear and convincing evidence.[121]  It is not necessary to find fault on the part of the debtor-in-possession before appointing a chapter 11 trustee in "the interests of creditors, any equity security holders, and other interests of the estate" pursuant to § 1104(a)(2).[122]

When deciding whether relief under § 1104(a)(2) is warranted, courts consider: (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee; balanced against the cost of the appointment.[123]  Notwithstanding the articulation of these factors, the § 1104(a)(2) standard is flexible.[124]  Ultimately, the court should consider the practical realities, necessities of the case, and the totality of the circumstances in determining whether to appoint a trustee.[125]

As noted, the day after USA filed the instant Motion, Debtor filed an application to employ

---

[117] *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995).

[118] *Id.*

[119] *See* 11 U.S.C. § 1104(a).

[120] *In re Adelphia Commc'ns Corp.*, 336 B.R. at 655.

[121] *See In re G-I Holdings, Inc.*, 385 F.3d 313, 315 (3d Cir. 2004); *see also Matter of Cajun Elec. Power Co-Op, Inc.*, 69 F.3d 746 (5th Cir. 1995) (opinion withdrawn); 7 *Collier on Bankruptcy* ¶ 1104.02 (16th ed. 2019).

[122] *In re Eurospark Industries, Inc.*, 424 B.R. at 627; *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008).

[123] *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).

[124] *In re Ridgemour Meyer Properties, LLC*, 413 B.R. at 112.

[125] *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168.  *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989).

James M. Pratt as its broker.[126]  This Court approved that request on July 8, 2021.[127]  Thus, USA's request that this Court appoint a trustee on the basis that Debtor has not applied to employ a broker is moot.  Additionally, Debtor provided credible testimony of its managing member, Mr. Jeffries, and its Chief Financial Officer, Mr. McElroy, that Debtor can correct its losses and operate profitably in the future.  As this Court found above, rehabilitation of Debtor is likely.  Two secured creditors, SILAC Insurance Company f/k/a Equitable Life & Casualty Insurance Company ("*SILAC*") and First Financial Bancshares, Inc. ("*First Financial*"), aligned themselves with Debtor, urging this Court to deny USA's Motion and give Debtor additional time to conduct a sale of its Property, based on their belief that a sale of the Property is in the best interest of creditors.[128]  SILAC and First Financial's alignment with Debtor demonstrate their confidence in Debtor's present management.  Lastly, because USA's only basis for requesting appointment of a trustee has been resolved, the benefits of appointing a trustee do not outweigh the costs.  Accordingly, USA's request to appoint a trustee is denied.

### E.  Whether this Court should impose the milestones for sale of the Property agreed upon by Debtor and two of its secured creditors

Debtor, along with SILAC and First Financial, requested on the record that this Court impose milestones to keep Debtor on track with the sale of its Property.  Those milestones are July 7, 2021 for a letter of intent; August 18, 2021 for an escrowed contract with no additional inspection period; and October 6, 2021 for closing and funding of the Property sale along with funding of the secured and administrative claims detailed above.  Debtor agreed to the appointment of a chapter 11 trustee should it fail to meet those milestones.[129]

---

[126] ECF No. 103.
[127] ECF No. 145.
[128] ECF No. 139 at 13:09–15:31 (SILAC), 15:32–16:00 (First Financial); ECF No. 148 at 1:19:15–1:22:52.
[129] ECF No. 148 at 1:01:27–1:02:25, 1:03:45–1:04:34.

Section 1104 permits appointment of a trustee "[a]t any time after the commencement of the case *but before confirmation of a plan*[.]"[130]  Confirmation of Debtor's Plan is scheduled for August 23, 2021, forty-four days before the final milestone, October 6, 2021.  If Debtor's Plan is confirmed before the final milestone, then § 1104(a) would prevent this Court from appointing a trustee should Debtor fail to meet that final milestone.  For this reason, Debtor, SILAC, and First Financial's request that this Court impose those milestones is denied.  However, should Debtor's Plan not be confirmed by October 6, 2021, SILAC and First Financial are free to file a further pleading requesting the appointment of a trustee.

## IV.  Conclusion

For the reasons stated supra, the "Expedited Motion by the United States to Either (a) Appoint Chapter 11 Trustee or (b) Convert Case to Chapter 7"[131] is denied.  An order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED July 20, 2021

Eduardo Rodriguez
United States Bankruptcy Judge

---

[130] 11 U.S.C. § 1104(a) (emphasis added).
[131] ECF No. 100.